# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NANCY LOU MILLER, | CASE NO. 3:13-cv-02594-GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 10, 11, 12, 17 |

## **MEMORANDUM**

### I. Procedural Background

On August 20, 2010, Plaintiff filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). (Tr. 111-21). On September 15, 2010, the Bureau of Disability Determination denied this application (Tr. 72-89), and Plaintiff filed a request for a hearing on November 17, 2010. (Tr. 92). On October 4, 2011, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 42-71). On January 19, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 25-41). On March 16, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 18-20), which the Appeals denied on August 21, 2013, thereby affirming the decision of the ALJ as the "final

decision" of the Commissioner. (Tr. 1-5).

On October 18, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On April 3, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 10, 11). On May 19, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 12). On June 27, 2013 Defendant filed a brief in response ("Def. Brief"). (Doc. 17). On July 7, 2014, the parties consented to transfer of this case to the undersigned for adjudication. (Doc. 18, 19). The matter is now ripe for review.

## II. Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y*

*of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### III. Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2)

whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## IV. Relevant Facts in the Record

Plaintiff was treated at Williamsport Hospital in 1991 and 1993 for an injury to her knee and a fall at work. (Tr. 300-06). The record does not contain any subsequent medical records until March of 2004, when Plaintiff had an overnight inpatient psychiatric admission at Geisinger Medical Center. (Tr. 506-09).

On April 22, 2004, Plaintiff followed-up with Dr. Jill Nye, D.O., her primary care physician. (Tr. 307-18). She reported that she "really wants further surgical eval[uation] of an umb[ilical] hernia that she has had for" more than ten years. (Tr. 307). Plaintiff also indicated that she "does not follow with a [doctor] regularly since she really has never had health ins[urance]." (Tr. 307). She followed-up with Dr. Nye on November 7, 2005 and reported that her "umbilical hernia is still bothering her and getting larger." (Tr. 315). Plaintiff was attempting to get insurance so that the hernia could be fixed. (Tr. 315).

On January 9, 2006, Plaintiff had umbilical hernia surgery. (Tr. 321, 548-66). On March 16, 2006, she had a cervical biopsy. (Tr. 531-32). She continued to complain of abdominal pain, and presented to the emergency room with an abdominal mass. (Tr. 510-66, 573-77, 591-630, 637-667). On June 9, 2006, she underwent an exploratory laparotomy, a total abdominal hysterectomy with bilateral salpingo-oophorectomy, and a partial omentectomy. (Tr. 631-634). After surgery, she had her staples removed and was diagnosed with a degenerating myoma. (Tr. 597-630, 637-77). She returned to the emergency room complaining of abdominal pain on June 18, 2006. (Tr. 361-77, 631-36).

Between February and July of 2006, Plaintiff saw Dr. Nye four times, complaining of chronic fatigue and other impairments. (Tr. 332-60, 391-426). In July of 2006, she indicated that she was following up for an abnormal cardiac test

done as part of pre-operative management for her hysterectomy. (Tr. 392). However, a stress test had been "completely normal" and she reported that she never had any symptoms of a cardiac episode. (Tr. 392). She denied other symptoms and was not taking any prescriptions. (Tr. 392). Dr. Nye noted that she was "leaving for nsg school in York soon and just wanted to be squared away with that." (Tr. 392). Plaintiff followed-up with Dr. Nye in August and September of 2007, and was diagnosed with new onset diabetes type II. (Tr. 196-240). Plaintiff followed-up with Dr. Nye every three months until January 30, 2009. (Tr. 196-240, 391-426).

Plaintiff presented to the emergency room at Shamokin Area Community Hospital in March and July of 2008, complaining of sinus, urinary, and skin impairments. (Tr. 241, 361-77).

On January 30, 2009, Dr. Nye noted that Plaintiff "was hoping to apply for disability due to having her medical problems and 'getting sick all the time'" (Tr. 400). Plaintiff also stated, "I just don't think that I can work anymore" (Tr. 400). Dr. Nye wrote:

> [Plaintiff] is rarely here for any app[ointmen]t not related to her normal diabetes follow-up so she is not sick frequently at least in the eyes of her chart here. I can't see where she could be disabled at least not based on her diabetes etc. She does have issues with her nerves. Seeing Dr. Tolan in sunbury thru MH/MR but doesn't like him. Since her M[edical] A[ssistance] card will run out not sure if she will follow up with anyone and asked me to help with nerves and sleep. Will try amitriptyline. She will call with any problems.

(Tr. 400).

From August 28, 2008 to July 21, 2009, Plaintiff was treated at Northwestern Human Services for depression. (Tr. 707-10). Plaintiff was "relatively high functioning and self-motivated. She has some good supports and many strengths with her positive disposition" (Tr. 707). At discharge, Ms. Fisher noted that Plaintiff had lost her insurance again, "but also increased her functioning." (Tr. 707). Plaintiff had attended eleven of fifteen scheduled appointments. (Tr. 707). Notes indicate "[t]reatment goals met-no further services needed." (Tr. 708).

When Plaintiff lost her insurance, she established care at a free medical clinic in Sunbury, Pennsylvania, A Community Clinic. (Tr. 258-70). She was treated there between February and August of 2010. *Id.* Plaintiff was treated for hypertension, diabetes, and lower back pain. (Tr. 266). For her back pain, she was prescribed Naproxen and Flexeril. (Tr. 266). On June 1, 2010, X-rays of Plaintiff's lumbar spine indicated "mild L4-5 and L5-S1 disc space narrowing." (Tr. 256).

On August 16, 2010, Plaintiff followed-up at the Community Clinic and continued to report back pain, and reported that it had spread to her left leg. (Tr. 265). She had tenderness in her lumbar spine. (Tr. 265). Her medications were continued and notes indicated that she was on temporary disability for three months. (Tr. 265).

Plaintiff returned to the emergency room at Shamokin Area Community Hospital on August 23, 2010, August 29, 2010, September 3, 2010, and September 6, 2010, complaining of abdomen pain, urinary frequency, and swollen lips and gums. (Tr. 271-82, 382-90, 479-86, 668-76).

Plaintiff followed-up with Dr. Nye on September 7, 2010 after her emergency room visits. (Tr. 391-426). She followed-up with Dr. Nye every three to five months thereafter through the date of the ALJ decision. (Tr. 427-65, 686-701).

On September 14, 2010, state agency physician Dr. Paul Taren, PhD, reviewed Plaintiff's file and issued an opinion. (Tr. 287-99). He opined that Plaintiff's mental health impairments were not severe and did not cause more than minimal effects on her ability to perform work-related functions. (Tr. 287). He opined that she had no restriction in activities of daily living, no difficulty in maintaining social functioning, and no episodes of decompensation of extended duration. (Tr. 297). He opined that she had mild difficulties in maintaining concentration, persistence, or pace. (Tr. 297). He explained that Plaintiff had been prescribed fluoxetine for depression in 2008 by her primary care doctor, with no additional mental health treatment history; no current use of psychotropic medications; presented as alert, oriented, well-spoken, and appropriate on mental

status examinations; and indicated in her function report that she has "numerous adaptive skills, remains sociable and gets along with others." (Tr. 299).

On February 9, 2011, Plaintiff followed-up with Dr. Nye. (Tr. 449). She reported that her "left hip and low back have been hurting her a lot lately" and Dr. Nye referred Plaintiff to an orthopedist. (Tr. 449, 452).

On March 11, 2011, Plaintiff had an evaluation with Dr. Thomas Dominick, M.D., at Sun Orthopedic Group. (Tr. 475). Plaintiff reported "left buttock pain" over the past year after she "fell over a curb in the parking lot and she was carrying things and really over the last year it has gotten worse." *Id.* Plaintiff reported "pain sitting and standing and radicular pain down her leg and numbness of the great toe." (Tr. 475). Plaintiff had sciatic notch tenderness and mild trochanteric tenderness, but her examination was otherwise normal. (Tr. 475). An x-ray of the left hip revealed no abnormalities (Tr. 474, 678). X-rays of the lumbar spine revealed mild narrowing of the L4-5 and L5-S1 intervertebral disc spaces with degenerative changes in the lower lumbar apophyseal joints. *Id.* Dr. Dominick indicated that he did not believe Plaintiff's leg pain was coming from her back, and scheduled her for an MRI. *Id.* On March 17, 2011, an MRI of Plaintiff's lumbar spine indicated "multilevel degenerative changes" and "small central disc protrusions at L4-5 and L5-S1." (Tr. 684).

On March 23, 2011, Plaintiff had a consultation with Dr. Patrick Konitzer, M.D., for arm numbness and pain radiating from her back to his left leg. (Tr. 476-78). On examination, notes indicate:

> She had relatively good range of motion. There was minimal to moderate paraspinal tenderness posteriorly. The upper extremities both showed good strength and normal sensation. I could not tell if there was any decreased sensation distally. Most of her numbness had occurred in her hands in the morning. Reflexes were also 2+ and .... Examination of her lower extremities showed no gross motor or sensory defect. The straight leg raise exam was negative bilaterally as was Patrick's sign. There was some paraspinal tenderness posteriorly over the right sacroiliac joint but lumbar spine, again, showed relatively good range of motion with some pain on flexion at about 30 to .J5 degrees. Reflexes thought were 2+ and symmetric on the lower extremities bilaterally...did not detect any hypoactvitiy in her reflexes. The rest of her neurologic exam including her cranial nerves were intact and non-focal.

(Tr. 477). He assessed Plaintiff to have "likely degenerative disc disease in the cervical and lumbar region" and scheduled her for epidural steroid injections depending on the results of Plaintiff's MRI, which he did not yet have. (Tr. 477).

Plaintiff was treated at Diakon Family Life Services from May 10, 2011 to September 27, 2011. (Tr. 487-503, 711-32). She was seen weekly, except for a gap between June 15, 2011 and July 27, 2011, when she was only seen once. *Id.* She carried diagnoses of Major Depressive Disorder recurring, moderate, and Anxiety Disorder. (Tr. 716).

On September 14, 2011, Dr. Raymond Kraynak, D.O., sent a letter to Plaintiff's counsel. (Tr. 504-05). Dr. Kraynak wrote that Plaintiff had been "under [his] care for treatment of multiple medical problems." (Tr. 504). He wrote that:

> [Plaintiff] has a history of degenerative Arthritis and Diabetes. She uses Metformin, Niaspan and Lovastatin for her problems. She complains of Diabetic Neuropathy. She complains of numbness and tingling in her legs. She sees Pain Management. She also gets blurred vision. She also has psychiatric problems and she sees a psychologist on a weekly basis. She also complains of severe pain in her low back. She has a pending MRI procedure scheduled.

(Tr. 504). On examination, Plaintiff had "some wheezing" in her lungs and she was obese. (Tr. 504). She had "decreased sensation in the lower extremities due to Diabetic Neuropathy" and "diminished pulses due to Peripheral Vascular Disease." (Tr. 504). She had decreased range of motion in her lumbar spine. (Tr. 504-05). He did not identify any specific limitations, but wrote that she was "totally disabled from any and all employment." (Tr. 505).

On September 27, 2011, an MRI of Plaintiff's lumbar spine indicated "no change. No disc herniations or significant stenosis. Mild facet degenerative changes at L2-3, L3-4, L4-5 and L5-S1." (Tr. 734). An MRI of Plaintiff's thoracic spine indicated a small disc protrusion and mild degenerative endplate changes. (Tr. 735).

### V.     Plaintiff Allegations of Error

#### A. The ALJ's rejecting of her treating source opinion

Plaintiff asserts that the ALJ erred in rejecting Dr. Kraynak's September 14, 2011 opinion. (Pl. Brief at 6). Plaintiff asserts that the ALJ failed to acknowledge objective findings contained in Dr. Kraynak's opinion. (Pl. Brief at 6). Defendant responds that it is the ALJ's responsibility to assess the RFC and "is not required to rely upon a medical source opinion." (Def. Brief at 16).

Dr. Kraynak's opinion is the only opinion in the record regarding Plaintiff's physical functioning. Generally, an ALJ may not reject all of the medical opinions in the record and assess an RFC that is greater than found by the medical professionals. As Courts in this District have repeatedly emphasized:

> The Court recognizes that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. *See Burnett v. Commissioner of Social Sec. Admin.*, 220 F.3d 112, 121–122 (3d Cir.2000). However, rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. *See Doak v. Heckler,* 790 F.2d 26, 29 (3d Cir.1986) ("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).

*Gormont v. Astrue,* 3:11-CV-02145, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013) (Nealon, J.); *see also Bloomer v. Colvin,* 3:13-CV-00862, 2014 WL 4105272, at *5 (M.D. Pa. Aug. 19, 2014) (Jones, J.); *House v. Colvin,* 3:12-CV-02358, 2014 WL 3866072, at *8 (M.D. Pa. Aug. 6, 2014) (Kane, J.); *Muhaw v.*

*Colvin*, CIV.A. 3:12-2214, 2014 WL 3743345, at *15 (M.D. Pa. July 30, 2014) (Mannion, J.). *Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014) (Mariani, J.); *Arnold v. Colvin*, 3:12-CV-02417, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014) (Brann, J.); *Kaumans v. Astrue*, 3:11-CV-01404, 2012 WL 5864436, at *12 (M.D. Pa. Nov. 19, 2012) (Caputo, J.); *Troshak v. Astrue*, 4:11-CV-00872, 2012 WL 4472024, at *7-8 (M.D. Pa. Sept. 26, 2012) (Munley, J.); *Shedden v. Astrue*, 4:10-CV-2515, 2012 WL 760632, at *11 (M.D. Pa. Mar. 7, 2012) (Rambo, J.); *Duvall-Duncan v. Colvin*, 1:14-CV-17, 2015 WL 1201397, at *11 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.); *McKean v. Colvin*, 1:13-CV-2585, 2015 WL 1201388, at *8 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.); *Hawk v. Colvin*, 1:14-CV-337, 2015 WL 1198087, at *12 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.).

As Judge Mariani explains in *Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014):

> The ALJ's decision to reject the opinions of Maellaro's treating physicians created a further issue; the ALJ was forced to reach a residual functional capacity determination without the benefit of any medical opinion.
> ...
> The ALJ's decision to discredit, at least partially, every residual functional capacity assessment proffered by medical experts left her without a single medical opinion to rely upon. For example, three physicians opined that Maellaro was limited in some way in his ability to stand and/or walk: Dr. Dittman opined that Maellaro could stand/walk for less than one hour, Dr. Singh believed that Maellaro could stand/walk for fewer than two hours, and Dr. Dawson opined

> that Maellaro could not stand or walk for any length of time. Tr. 183, 211, 223. In rejecting these three opinions, there were no other medical opinions upon which the ALJ could base her decision that Maellaro essentially had no limitations in his ability to stand or walk. Tr. 283. Consequently, the ALJ's decision to reject the opinions of Drs. Singh and Dawson, and the ALJ's determination of Maellaro's residual functional capacity, cannot be said to be supported by substantial evidence.

*Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014); *see also* Bloomer v. Colvin, 3:13-CV-00862, 2014 WL 4105272, at *6 (M.D. Pa. Aug. 19, 2014) (Jones, J.); ("The ALJ did not cite to a single medical opinion that contradicted [the treating source] opinion; thus, the ALJ improperly set his "own expertise against that of a physician who present[ed] competent medical evidence.' Consequently, the AJL's residual functional capacity determination is not supported by substantial evidence.") (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (2d Cir.1999)).

Plaintiff also asserts that the ALJ rejected Dr. Kraynak's opinion for the wrong reasons. Plaintiff specifically asserts that the ALJ failed to acknowledge objective findings contained in Dr. Kraynak's opinion. (Pl. Brief at 6). Defendant responds that the ALJ properly rejected Dr. Kraynak's opinion on the ground that it was on an issue reserved to the Commissioner and was inconsistent with other evidence. (Def. Brief at 16-17). Defendant cites the absence of opinions from Plaintiff's other providers and Dr. Nye's indication, prior to Plaintiff's alleged onset date, that "questioned whether she was disabled." (Tr. 17). Defendant also

contends that the ALJ properly evaluated the medical evidence to conclude that the opinion was not well-supported. (Def. Brief at 18-19).

An ALJ must weigh medical opinions in making an RFC assessment. The social security regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight. 20 C.F.R. § 416.927(d)(2). Section 404.1527(c) establishes the factors to be considered by the ALJ when the opinion of a treating physician is not given controlling weight. Under subsections (c)(1) and (c)(2), the opinions of treating physicians are given greater weight than opinions of non-treating physicians and opinions of examining physicians are given greater weight than opinions of non-examining physicians, as discussed above. Section 404.1527(c)(2) also differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship. Subsection 404.1527(c)(3) provides more weight to opinions that are well supported, which means that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." Subsection 404.1527(c)(4) states that "the more consistent an opinion is with the

record as a whole, the more weight we will give to that opinion." Subsection 404.1527(c)(5) provides more weight to specialists, and subsection 404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

In *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000), the Third Circuit set forth the standard for evaluating the opinion of a treating physician, stating that:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer [v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999)] (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones*, 954 F.2d at 128; *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Brewster*, 786 F.2d at 585. The ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. See *Adorno*, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710 F.2d at 115.

*Id.* at 317-318.

Rejecting the opinion of a treating opinion because it is on an issue reserved to the Commissioner without attempting to recontact the treating physician for clarification generally constitutes rejecting evidence for the "wrong reason:"

> Nevertheless, our rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.

SSR 96-5p.[1] "SSR 96-5p emphasizes to the adjudicator the importance of making 'every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.'" *Ferari v. Astrue,* CIV.A. 1:07-CV-01287, 2008 WL 2682507 at *6 (M.D. Pa. July 1, 2008) (Kane, C.J.). An ALJ may not misconstrue evidence in rejecting a treating opinion:

> Since the ALJ did not consider all the relevant record evidence, and, more significantly, misconstrued the evidence considered, his conclusion that Cotter's impairment did not prevent the performance of his past relevant work, which is based on the ALJ's understanding of the physical demands of welding, must be reconsidered.

*Cotter v. Harris,* 642 F.2d 700, 707 (3d Cir. 1981).

Here, the ALJ failed to provide any legitimate reason to reject Dr. Kraynak's opinion. First, the ALJ misconstrued Dr. Kraynak's opinion. *Id.* The ALJ wrote

---

[1] "Social Security Rulings...are binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b).

that "Dr. Kraynayk [sic] merely restates the claimant's complaints of numbness and tingling and the diagnosis of degenerative arthritis and diabetes." (Tr. 16). However, Dr. Kraynak specifically identified objective examination findings of wheezing, obesity, "decreased sensation in the lower extremities," diminished pulses, and decreased range of motion in her lumbar spine. (Tr. 504-05). The ALJ does not mention these findings, so the Court cannot tell if they were "not credited or simply ignored." *Cotter*, 642 F.2d at 705.

Second, the ALJ was not entitled to reject Dr. Kraynak's opinion on the ground that it was on an issue reserved to the Commissioner because the ALJ made no effort to recontact Dr. Kraynak. SSR 96-5p; *Ferari v. Astrue*, CIV.A. 1:07-CV-01287, 2008 WL 2682507 at *6 (M.D. Pa. July 1, 2008) (Kane, C.J.).

Third, the ALJ was required to independently interpret laboratory reports and other medical evidence. (Tr. 16-17). The ALJ specifically wrote:

> Aside from Dr. Kraynak's letter, there is no statement by an acceptable medical source providing an opinion as to the claimant's physical capacity. In the absence of residual functional capacity finding, the undersigned looked to the medical evidence to determine the claimant's residual functional capacity.

(Tr. 16). The ALJ has no medical training and is not entitled to independently review and interpret laboratory reports to reject the opinion of a medical professional:

> By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a

> physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence. Again, if the ALJ believed that Dr. Scott's reports were conclusory or unclear, it was incumbent upon the ALJ to secure additional evidence from another physician.

*Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

Although an RFC may, in rare cases, be supported by substantial evidence even when not supported by a medical opinions, this is not one of those rare case First, the ALJ rejected Dr. Kraynak's opinion for the "wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993). Second, Plaintiff presented at least some objective evidence that supported her claims. Third, the ALJ failed to properly assess Plaintiff's credibility. The ALJ cited Plaintiff's "daily functioning," but does not explain what aspect of Plaintiff's "daily functioning" contradict her claims or otherwise supports an adverse credibility inference. (Tr. 15-17). The only other reason provided by the ALJ for rejecting Plaintiff's credibility was a lack of objective evidence, but a lack of objective evidence, alone, is insufficient to draw an adverse credibility inference. 20 C.F.R. § 416.929(c) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work (or if you are a child, to function independently, appropriately, and effectively in an age-appropriate manner) solely because the available objective medical evidence does not substantiate your statements"). Thus, the Court remands for the ALJ to properly

assess Plaintiff's residual functional capacity. Because the Court recommends remand on these grounds, the Court declines to address Plaintiff's other allegations of error.

### VII.   Conclusion

The Court finds that the ALJ's decision lacks substantial evidence because the ALJ failed to appropriately base the RFC on medical evidence. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.

Dated: April 10, 2015                               <u>     s/Gerald B. Cohn     </u>
                                                    GERALD B. COHN
                                                    UNITED STATES MAGISTRATE JUDGE